IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES MACKAY and CELEBRITY FOODS, INC., <br>     Plaintiffs, <br><br> v. <br><br> WILLIAM F. DONOVAN and SPINE PAIN MANAGEMENT, INC. <br>     Defendants. | CIVIL ACTION <br> NO. 10-218 |

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                                                                                                                       July 1, 2011

      Plaintiffs James MacKay and Celebrity Foods, Inc. ("MacKay") filed suit against Defendant Spine Pain Management, Inc. ("SPM" or "Versa Card") and its president and CEO William Donovan, alleging they failed to comply with terms of an out-of-court Mutual Release and Settlement Agreement ("Settlement Agreement") entered into by the parties in 2008. After Plaintiff's breach of contract claims survived a motion to dismiss, SPM filed an answer and counterclaim. Now before the Court is Counterdefendants' Motion for Judgment on the Pleadings, seeking to dismiss SPM's counterclaims.

**Background**

      On April 28, 2008, Versa Card (the predecessor to SPM) entered into a Stock Purchase Agreement to purchase all outstanding shares of First Versatile Smartcard Solutions Corporation ("FVS") from MacKay Group Ltd. ("MGL"). Plaintiff James MacKay, president of MGL and Celebrity Foods, was a significant shareholder of Versa Card. Later that year, the parties wished to rescind the Stock Purchase Agreement because the acquisition did not meet the expectations of

Versa Card and was damaging to its business. The parties rescinded the sale, without litigation, by entering into a Mutual Release and Settlement Agreement on December 30, 2008.[1] Under the terms of the Settlement Agreement, Versa Card returned all of the capital stock in FVS to MGL, and James MacKay tendered to Versa Card 16,925,334 of his shares in Versa Card and retained 408,000 shares.[2] Celebrity Foods retained 100,000 shares in Versa Card. Those retained shares were subject to an SEC-mandated restricted trading period, which expired on March 9, 2009.

With the execution of the Settlement Agreement, Versa Card exited the credit card business and disposed of the assets of FVS. By November 2009, Versa Card had changed its name to Spinal Pain Management, Inc. and was operating as a medical pain management company.

After the expiration of the SEC restricted trading period on March 9, 2009, Plaintiffs made known their desire to sell their remaining shares in Versa Card/SPM. Plaintiffs filed this lawsuit on January 19, 2010, alleging that Defendants were prohibiting them from trading their shares in SPM via a Stop Transfer Resolution, in violation of the terms of the Settlement Agreement.

SPM filed a counterclaim, alleging that it had entered into the Stock Purchase Agreement and acquired the FVS shares in April 2008 based upon Mackay's fraudulent misrepresentations regarding the business plan, contracts, assets, financing and employees of FVS. After the acquisition, it learned that FVS was actually worthless. Accordingly, Count I of SPM's

---

[1] The parties to the Settlement Agreement were Versa Card, MacKay Group, Ltd., James MacKay, Shawn Mulcahy, Celebrity Foods, Inc., Michael Cimino, Rene Hamouth, Richard Specht, and William Dunavant.

[2] See Mutual Release and Settlement Agreement. Holders of other third party shares were also required to tender all shares to Versa Card.

2

counterclaim alleges that Counterdefendants entered into a scheme to fraudulently induce SPM to acquire FVS. Counterdefendants are alleged to have knowingly and intentionally misrepresented the value, assets, and viability of FVS, by providing business plans and balance sheets from another business, Recharge Plus, under FVS's name. SPM purchased the FVS stock in reliance on the misrepresentations, and alleges that it consequently sustained damage to its business and reputation, lost the confidence of its shareholders, and had difficulty securing financing.

SPM's second count alleges violations of the Securities and Exchange Act (SEA). Specifically, SPM alleges that Counterdefendants made misrepresentations in Securities and Exchange Commission (SEC) filings regarding Versa Card and FVS, in violation of Section 10(b) of the SEA and Rule 10b-5, in order to entice investors to purchase stock.

Finally, in Count III, SPM alleges that Counterdefendants breached their fiduciary duties to investors while they were directors of the company by making false representations and promises to investors and by using resources of the corporation for personal expenses.[3]

Counterdefendants have filed this Motion for Judgment on the Pleadings, arguing that when SPM (then Versa Card) discovered that the acquisition of FVS was not advantageous, it rescinded the sale by way of the Settlement Agreement. That Settlement Agreement includes a general release and covenant not to sue.

On this Motion for Judgment on the Pleadings, the Court must determine whether the terms of the Release are broad enough to preclude all three counterclaims. If so, the Court must

---

[3] The latter allegation is the only allegation which does not directly relate to Versa Card's acquisition of FVS.

address SPM's arguments that the Release is ambiguous or was induced by fraud.

**Standard of Review**

Federal Rule of Civil Procedure 12(c) allows a motion for judgment on the pleadings after pleadings are closed. Judgment on the pleadings is appropriate when the "movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."[4] As in a motion to dismiss under Federal Rule 12(b)(6), courts must view the facts and inferences presented in the pleadings in the light most favorable to the non-moving party.[5] The Court may consider indisputably authentic documents attached to the pleadings if they are integral to the claims.[6]

**Discussion**

### Scope of the Contractual Releases of Claims

A contractual release from litigation is an affirmative defense to a claim against any party to that release.[7] That defense is generally asserted by motion for judgment on the pleadings or summary judgment.[8] If the movant clearly establishes that there are no material issues of fact, a contractual release from a claim can be a complete defense to the pleadings.[9] Releases are construed pursuant to the traditional principles of contract law, and a release that is not obtained

---

[4] Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008); Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005).

[5] Allah v. Al-Hafeez, 226 F.3d 247, 249 (3d Cir. 2000).

[6] Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004).

[7] Fed. R. Civ. P. 8(c).

[8] Straight Arrow Prods. v. Conversion Concepts, Inc., No. 01-221, 2001 WL 1530637, *2 (E.D. Pa. Dec. 3, 2001).

[9] Id.

by fraud, duress, or mutual mistake is binding between the parties.[10] "The fundamental rule in interpreting a contract is to ascertain and give effect to the intent of the contracting parties. . . . The intent of the parties to a written agreement is embodied in the writing itself. . . . When contractual language is clear and unequivocal, its meaning must be determined by its contents alone."[11]

In this case, the Release contained in the Settlement Agreement reads:

**Release by Versa Card.** Versa Card and the Versa Stockholder Releasors hereby jointly and severally release, acquit, and forever discharge MGL, each of MGL's past, present and future officers, directors, shareholders, agents, employees, attorneys, heirs, successors, assigns, parents, subsidiaries, affiliates, and representatives, JK, Mulcahy, CFI, and Cimino, and their respective heirs, successors, assigns, and representatives (collectively the **"MGL Releasees"**) of and from *any and all actions, causes of action, claims, suits, damages, judgments, and demands whatsoever in law and/or equity, known or unknown, accrued or unaccrued, suspected or unsuspected, fixed or contingent, liquidated or unliquidated, matured or unmatured, developed or undeveloped, discoverable or undiscoverable*, which Versa Card and the Versa Card Stockholder Releasors had, now has, or may later have or claim to have against the MGL Releases, or any of them, involving or arising out of any act or failure to act, or any transaction, event, circumstance, occurrence, or state of facts, which existed, occurred, or transpired or is alleged to have existed, occurred, or transpired at any time from the beginning of time through and including the Effective Date, including without limitation, all matters arising out of or related to the Original Agreement, Acquisition Agreement, the issuance of the Acquisition Shares and the Additional Shares, the rescinding of the transactions contemplated by the Acquisition Agreement, and all other matters whatsoever which have or allegedly have occurred or transpired at any time from the beginning of time through and including the Effective Date, excluding only the rights of Versa Card or the Versa Stockholder Releasors arising out of this Mutual Release.[12]

Counter Plaintiff argues that a release covers only those matters which may be fairly said

---

[10] Jordan v. SmithKline Beecham, Inc., 958 F. Supp. 1012, 1020 (E.D. Pa. 1997); Black v. Jamison, 913 A.2d 313, 318 (Pa. Commw. Ct. 2006); Davis ex. rel. v. Gov't. Emps. Ins. Co., 775 A.2d 871 (Pa. Super. Ct. 2001).

[11] Crawford Cent. Sch. Dist. v. Commonwealth of Pa., 888 A.2d 616, 623 (Pa. 2005)(citation omitted).

[12] Mutual Release and Settlement Agreement (italics added), Doc. No. 34, Ex. 1.

to have been within the contemplation of the parties when the release was given. However, "a party cannot evade the clear language of the release by contending that he did not subjectively intend to release the claim in question."[13] SPM cannot avoid the effect of this Release, which precludes claims "known or unknown . . . suspected or unsuspected," by arguing that it learned of the claim only after agreeing to the Release.[14] The Third Circuit has ruled that a general release extinguishes all covered claims, including any claim unknown at the time of the release.[15]

The Release in this case is broad and written in general terms. It clearly indicates that the parties intended to release Counterdefendants from any future claims related to the FVS transactions. This includes the claims set forth in Counts I and II of the counterclaim. The catch-all phrase in the release— " . . . and all other matters whatsoever which have or allegedly have occurred or transpired at any time from the beginning of time through and including the Effective Date"— precludes the claims for breach of fiduciary duty set forth in Count III of the counterclaim, which are, at least in part, unrelated to the FVS transaction. Accordingly, if the Court finds that the Settlement Agreement, including the Release, is valid and enforceable, all of the counterclaims must be dismissed.

**Ambiguity**

SMH argues that the Release is ambiguous and therefore external evidence is required to determine the parties' intent regarding the scope of the Release. The terms of a contract are ambiguous if the terms are "reasonably or fairly susceptible of different constructions and are

---

[13] Jordan, 958 F. Supp. at 1019-20 (citing Buttermore v. Aliquippa Hosp., 561 A.2d 733, 735 (Pa. 1989)).

[14] Buttermore, 561 A.2d at 735.

[15] Fisher Dev. Co. v. Boise Cascade Corp., 37 F.3d 104 (3d Cir. 1994).

capable of being understood in more than one sense."[16] The language of a contract is unambiguous if a court is able to determine its meaning without any guide other than knowledge of the basic facts on which the contract's meaning depends.[17]

The Release contains both a specific statement of purpose ("The parties desire to rescind the transactions contemplated by the Acquisition Agreement. . .") and a general release as to each party that includes a catch-all release (". . . all other matters whatsoever which have or allegedly have occurred or transpired at any time from the beginning of time through and including the effective date").[18] SPM argues that because the Release is stated more broadly than is necessary to achieve the stated purpose, there is ambiguity as to the meaning of the Release itself.

The Court finds that the Release, though broad, is unambiguous. It is impossible for the Court to interpret the catch-all release to mean anything other than what it says, as the language is clear and cannot be understood in more than one sense. In light of the fact that the Release was drafted to cover all claims "known or unknown," "accrued or unaccrued," "suspected or unsuspected," "fixed or contingent," "liquidated or unliquidated," "matured or unmatured," "developed or undeveloped," "discoverable or undiscoverable," the Court finds that the parties intended to and did create a very broad release which extinguishes all possible claims relating to the FVS transactions, *and* all other claims, regardless of the subject matter, that might arise between the settling parties as well.

The fact that the parties mutually released each other from claims not directly related to

---

[16] Black, 913 A.2d at 318.

[17] Id.

[18] The Settlement Agreement contains a similar, broadly worded Release pertaining to SPM.

7

the FVS transaction is not evidence of ambiguity. In drafting a settlement agreement, parties bargain for the best possible terms and conditions, consideration is exchanged, and the parties seek closure and finality. The Court finds that no discovery or extrinsic evidence is required as to intent and construction of the terms, because the language of the Settlement Agreement, and in particular the Release, is unambiguous. Unless induced by Fraud, the Release precludes all of SPM's claims.

**Fraud in the Inducement**

A release that is obtained by fraud is not binding between the parties.[19] In order to state a prima facie case of fraud, a plaintiff must show (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by the reliance.[20]

SPM argues that the Release is invalid because it was induced by fraud. SPM states that Counterdefendant first fraudulently induced SPM to acquire FVS, and later fraudulently induced SPM to enter into the Settlement Agreement and Release, "thereby alleviating MGL's liability for their prior fraudulent conduct."[21] SPM admits that it had business reasons for wishing to rescind the earlier acquisition of FVS shares, and that the Settlement Agreement was a mechanism by which it could do so. However, SPM argues that had it known of the fraudulent conduct relating to the sale of FVS prior to the Settlement Agreement, it would

---

[19] Cf. Jordan, 958 F. Supp. at 1020; Black, 913 A.2d at 318.

[20] Id.

[21] Doc. No. 39 at ¶ 14.

8

have pursued a different mechanism to reverse the sale. Essentially, SPM claims that it would have acted differently if it had been aware of the early fraud, but it fails to allege facts to support a finding that a separate act of fraud induced them to enter into the Settlement Agreement.

In fact, SPM alleges that at the time the Settlement Agreement was reached, SPM knew that MacKay's representations regarding the value of FVS were false. Thus, the Settlement Agreement could not have been induced by MacKay's misrepresentations. Having discovered that it had purchased essentially worthless stock, SPM wished to divest itself of FVS. At the time they entered into the Settlement Agreement, SPM alleges that it was still unaware that the prior representations as to FVS's value were *fraudulent*, but admits that SPM knew those representations were *false* and it was no longer relying upon them. SPM points to no additional misrepresentations made by Counterdefendants which were material to the decision to enter into the Settlement Agreement.

While SPM has alleged that the original FVS transaction may have been induced by fraudulent behavior, SPM alleges no facts from which the Court can conclude that the Settlement Agreement was induced by fraud. Accordingly, the Settlement Agreement, in which SPM contracted away its right to assert the claims set forth in their counterclaim, is valid and enforceable.

## Conclusion

For the reasons set forth above, the Court finds that the Counterdefendants have adequately established their affirmative defense to the counterclaims. Because a valid Release precludes SPM's counterclaims, the motion for judgment on the pleadings will be granted.