**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MACKAY and CELEBRITY FOODS, INC.,** | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **NO. 10-218** |
| | : | |
| **WILLIAM F. DONOVAN and SPINE PAIN MANAGEMENT, INC.** | : | |
| **Defendants.** | : | |
| | : | |

**MEMORANDUM OPINION AND ORDER**

RUFE, J.                                                February 14, 2012

Plaintiffs James MacKay and Celebrity Foods, Inc. filed the instant action against

Defendants Spine Pain Management, Inc. ("SPM") and its president and CEO William Donovan,

alleging that SPM failed to comply with the terms of an out-of-court Mutual Release and

Settlement Agreement ("Settlement Agreement") entered into by the parties in 2008.  Now

before the Court are Plaintiffs' Motion for Summary Judgment on Liability and Defendants'

Cross-Motion for Summary Judgment.

## I.      FACTUAL BACKGROUND

### A.      General Factual Background

Until the end of 2008, MacKay was a significant shareholder in Versa Card, a Delaware

corporation with its principal place of business in Philadelphia, Pennsylvania.  MacKay was also

president of Celebrity Foods, Inc. ("Celebrity Foods") and MacKay Group Limited ("MacKay

Group").  MacKay Group owned First Versatile Smartcard Solutions Corp. ("Versatile

Smartcard").

On April 28, 2008, Versa Card entered into a Stock Purchase Agreement to purchase all

outstanding shares of Versatile Smartcard from MacKay Group.  Later that year, Versa Card

wished to rescind that Stock Purchase Agreement, having discovered that the acquisition did not

meet its expectations and was damaging to its business and reputation.  On December 30, 2008,

the parties rescinded the sale, without litigation, by entering into a Mutual Release and

Settlement Agreement.[1]  Under the terms of the agreement, Versa Card returned all of its capital

stock in Versatile Smartcard to MacKay Group, James MacKay tendered 16,925,334 of his

shares in Versa Card back to Versa Card, retaining 408,000 shares, and Celebrity Foods tendered

all but 100,000 of its shares in Versa Card.  Plaintiffs' Retained Shares were subject to a

six-month restricted trading period.  Defendants agreed to cooperate fully with Plaintiffs in

having the restrictions removed from their Retained Shares at the end of the six-month period.

Following execution of the Settlement Agreement, Versa Card disposed of the assets of

Versatile Smartcard and exited the credit card business.  As of January 5, 2009, the corporation

notified the SEC that its principal place of business was now Houston, Texas. Defendant William

Donovan signed an SEC filing dated March 2, 2009, listing himself as CEO of Versa Card.  On

November 11, 2009, Versa Card changed its name to Spine Pain Management, Inc. ("SPM") and

changed its primary business from debit cards to medical pain management.  Donovan was listed

as the President, CEO, and Principal Financial Officer of SPM on SEC filings dated November

12, 2009.  Because their Retained Shares were under trade restrictions at the time, Plaintiffs

remained shareholders in the successor company.

---

[1] The parties to the Settlement Agreement were Versa Card, MacKay Group, James MacKay, Shawn
Mulcahy, Celebrity Foods, Inc., Michael Cimino, Rene Hamouth, Richard Specht, and William R. Dunavant.

B.    <u>The Date of Issuance of the Retained Shares</u>

The 408,000 shares of Versa Card retained by MacKay were the shares he held in street name, originally issued to him on November 17, 2007.[2]  Following execution of the Settlement Agreement, he was issued a new stock certificate for his Retained Shares (Certificate 3747).  The new certificate was issued on January 28, 2009.

Celebrity Food obtained its Retained Shares on September 8, 2008, but was issued a new stock certificate (Certificate 3746) for its 100,000 Retained Shares on December 30, 2008, the same day the Settlement Agreement was executed.

Certificates 3746 and 3747 were subject to restrictions on trading, per the Settlement Agreement and SEC Rule 144.[3]

C.    <u>Communications Regarding the Restrictions on Trading Retained Shares</u>

On March 9, 2009, Celebrity Foods wrote to Defendants and asked them to lift the restrictions on its Retained Shares (Certificate 3746).  On March 27, 2009, Versa Card officer Richard Specht sent a Stop Transfer Resolution to the transfer agent for Versa Card, Signature Stock Transfer, Inc., requiring that the restrictions prohibiting Plaintiffs from trading their Versa Card shares be continued until Versa Card issued written authorization to lift them.  On March 31, 2009, Celebrity Foods asked Donovan, by e-mail, to remove the restrictions on its stock certificate. On April 2, 2009, Celebrity Foods and MacKay sent an e-mail demand to Versa Card for removal of the restrictive legends on both Certificates 3746 and 3747.  On April 3, 2009, a

---

[2] Defendants argue that the Retained Shares may have been among the shares issued to MacKay on September 19, 2008 or October 15, 2008.  However, the Settlement Agreement specifically identifies the Retained Shares as the shares MacKay held in street name.  His later acquired shares were not so held.

[3] 17 C.F.R. § 230.144.

3

representative of Versa Card replied by e-mail "Dream on, paisan, dream on."  Defendant Donovan also sent an e-mail to Mackay explaining that Versa Card would re-evaluate the Stop Transfer Resolution only after an audit and further investigations.

Defendants deny receiving "any further demands and/or requests from either Plaintiff for release of the restricted shares subsequent to [Donovan's] April 3, 2009 e-mail."[4]  However, on November 13, 2009, counsel for Plaintiffs sent a letter captioned "Re: Rescission of Mutual Release & Settlement Agreement; Demand for Payment of Monies/Damages" to Donovan.[5] They received no reply.  Defendants do not deny receipt of that letter.

On January 19, 2010, Plaintiffs filed the instant complaint, alleging that issuance of the Stop Transfer Resolution violated the Settlement Agreement, because the Settlement Agreement obligated Versa Card to "fully cooperate [with the] holders of the Retained Shares in causing the restrictive legends to be removed from the certificates evidencing the Retained Shares."

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]  A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[7]  A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving

---

[4] Doc. No. 51, Ex. 3.

[5] Doc. No. 53, Ex. AA.

[6] Fed. R. Civ. P. 56 (2011).

[7] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

party."[8]

In considering a summary judgment motion, the Court does not weigh the evidence or make credibility determinations; "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[9]

## III.   DISCUSSION

### A.   Breach of Contract

The Settlement Agreement provides that Delaware law will apply to disputes between the parties arising under that Agreement.  Under Delaware law, a settlement agreement and release is a contract, and construction of the contract is a matter of law.[10]  To state a claim for breach of contract, plaintiffs must allege: 1) the existence of an enforceable contract; 2) a breach of a contractual obligation; and 3) resulting damages.[11]  Here, Defendants do not challenge Plaintiffs' assertion that the parties were governed by an enforceable contract, but argue that, under a proper interpretation of the contract, Defendants did not breach their obligations to Plaintiffs, and furthermore, Plaintiffs suffered no damages.

Plaintiffs' Motion for Summary Judgment argues that Defendants breached the terms of the Settlement Agreement when they issued an informal Stop Transfer Resolution on March 27, 2009 and, more generally, by refusing to "fully cooperate" with Plaintiffs in the lifting of the restrictions on the Retained Shares despite Plaintiff's requests beginning in March 2009.  In

---

[8] Id.

[9] Anderson, 477 U.S. at 255.

[10] Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991); Jackson v. Carroll, 643 F. Supp. 2d 602, 612 (D. Del. 2009).

[11] VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).

particular, Plaintiffs argue that Defendants breached the following provisions of the Settlement

Agreement:

> 6.  Non-Interference
>    (a)  Once the Retained Shares have been held for 6 months from the original
> date of issuance, Versa Card shall fully cooperate [with] the holders of the
> Retained Shares in causing the restrictive legends to be removed from the
> certificates evidencing the Retained Shares, if and to the extent the holder of such
> shares is not then an affiliate of Versa Card and if and when thereafter that such
> holder is not an affiliate of Versa Card, Versa Card shall promptly after request
> fully cooperate in causing the removal of such restricted legend.
>    (b) Neither Versa Card, nor any Versa Stockholder Releasor, nor any party
> acting on its or their behalf, shall initiate any action to cancel, reduce, stop
> transfer, or terminate the Retained Shares or to interfere with the lawful
> disposition of the Retained Shares in accordance with [SEC] Rule 144.

Defendants argue that they did not breach their contractual obligations, because: 1)

Plaintiffs made their request to remove the restricted legends prematurely; 2) Plaintiffs did not

properly renew their request after the six-month waiting period had expired; and 3) Plaintiffs

failed to follow the protocol required by the transfer agent.

### 1.  *Expiration of the Restricted Trading Period*

First, the Court must resolve the parties' dispute as to when the parties intended the

six-month restricted trading period to expire.[12]  As this is a matter of contract interpretation, it is

a question of law properly before the Court on a Motion for Summary Judgment.[13]

---

[12] Plaintiffs' response to Defendants' Motion for Summary Judgment argues that, in the Court's
Memorandum Opinion and Order dated July 1, 2011, the Court "ruled" that the SEC restricted trading period for
Plaintiffs' shares expired on March 9, 2009.  Plaintiffs have apparently misconstrued the Court's summary of
Plaintiffs' own allegations, set forth in the "Background" section of its Opinion, as a ruling.  The subject of the
Motion for Judgment on the Pleadings decided by the Court's July 1, 2011 Opinion was whether the terms of the
Release in the Settlement Agreement precluded Defendants' counterclaims.  The date on which the restricted trading
period expired was not at issue in the Motion for Judgment on the Pleadings; the parties did not brief that question,
and the Court did not rule on it.

[13] Pellaton, 592 A.2d at 478; Jackson, 643 F. Supp.2d at 611.

In interpreting a contract, the Court must be guided not by the subjective intent of the parties, but "by their objective conduct and manifestations."[14]  In the absence of ambiguity, the Court should enforce a contract according to its terms, and cannot use extrinsic evidence "to interpret the intent of the parties, to vary the terms of the contract, or to create ambiguity."[15]  The Court should interpret each provision in light of the contract as a whole and in a manner that will not render another provision superfluous or without force.[16]  The Court must also interpret contract terms in a manner consistent with governing law, in this case SEC Rule 144.[17]

To determine when the six-month trade restriction on Plaintiffs' shares expired, the Court must interpret the non-interference clause of Settlement Agreement,[18] which states in relevant part: "Once the Retained Shares have been held for 6 months from the original date of issuance, Versa Card shall fully cooperate the holders of the Retained Shares in causing the restrictive legends to be removed from the certificates evidencing the Retained Shares . . . ."  Plaintiffs argue that "original date of issuance" refers to the dates on which they originally purchased their shares in Versa Card.  While the Court agrees that, reviewed in isolation, the term "original" suggests such an interpretation, the Court must also interpret this clause in a manner consistent with the Settlement Agreement as a whole and relevant SEC regulations.  In addition to requiring Versa Card to cooperate with Plaintiffs in removing restrictions at the end of a six-month holding

---

[14] Wilcher v. City of Wilmington, 139 F.3d 366, 372-73 (3d Cir. 1998).

[15] MBIA Ins. Corp. v. Royal Indem. Co., 426 F.3d 204, 210 (3d Cir. 2005).

[16] BAE Sys. Aircraft Controls, Inc. V. Eclipse Aviation Corp., 2004 U.S. Dist. LEXIS 23346, at *12 (D. Del. Nov. 10, 2004); In re Marvel Entm't Group, Inc., 2002 U.S. Dist. LEXIS 3114, at *22 (D. Del. Feb. 26, 2002).

[17] Settlement Agreement section 6(b).

[18] Settlement Agreement section 6(a),(b).

7

period, the Non-Interference provision also creates a "Protected Period," defined as six months

after the Effective Date of the Settlement Agreement, within which Versa Card my not effect

stock splits, consolidations, or other transactions which would dilute the value of Plaintiffs'

Retained Shares.[19]  In addition, SEC Rule 144(d)(1)(i) imposes a "minimum of six month"

holding period for restricted securities.  As the securities originally issued to Plaintiffs were

unrestricted, the Court finds that SEC Rule 144 imposes a holding period extending six months

from the dates on which the *restricted* stock certificates were issued, in December 2008 and

January 2009.  In keeping with the contract as a whole and relevant SEC regulations, the Court

interprets the term "original date of issuance" to mean December 30, 2008 with regard to

Certificate 3746, and January 28, 2009 with regard to Certificate 3747.  Therefore, Defendants'

failure to cooperate with Plaintiffs' March and April 2009 requests to lift restrictions from their

Retained Shares was not a breach of the terms of the Settlement Agreement.

2.  *Later Requests to Lift Restrictions*

Given the Court's finding that the Defendants did not breach the Settlement Agreement

by refusing to lift the trade restrictions on the Retained Shares in response to requests made

March and April 2009, the only issue remaining is whether Defendants breached the terms of the

Settlement Agreement by failing to cooperate with requests to lift the restrictions made after the

restrictions had expired.

Although premature, Plaintiffs' March and April 2009 communications with Versa Card

input Versa Card on notice of Plaintiffs' wish to lift the restrictions on their Retained Shares.

Yet Versa Card took no action in July or August 2009, after the Retained Shares had been held

---

[19] Settlement Agreement section 6(c).

for six months.

  Furthermore, it is undisputed that by November 2009 Defendants had a contractual duty to cooperate with Plaintiffs in lifting restrictions on the Retained Shares if Plaintiffs renewed their requests.  Plaintiffs allege that a letter was sent to Versa Card by e-mail on November 13, 2009 ("Letter").[20]  The Letter, captioned "Re: Rescission of Mutual Release & Settlement Agreement; Demand for Payment of Monies/Damages," sets forth Plaintiffs' belief that Defendants have "unilaterally frustrated" Plaintiffs' attempts to utilize their "sole consideration" for the Settlement Agreement, and Plaintiffs' intent to rescind the Settlement Agreement as void. That said, the Letter also notes Plaintiffs' willingness to reinstate the Settlement Agreement if Defendants lift the trade restrictions on the Retained Shares, pay damages for the lost use of Plaintiffs' moneys, and pay the difference between the current trading price and the highest price at which the stock traded since Plaintiffs' initial demand.  Because the Letter assumed that Plaintiffs' March and April requests were made in compliance with the terms of the Settlement Agreement, it was not worded as a renewed request for Defendants to lift the restrictions on the Retained Shares, and its demands went well beyond such a request.  Nevertheless, the Court finds that the Letter was sufficient to put Versa Card on notice that, as of November 13, 2009, Plaintiffs still wished to have the trade restrictions removed.  Defendants were obligated to cooperate fully with Plaintiffs in that regard.

  Having received notice that Plaintiffs considered them in breach of the Settlement

---

[20] Attached to Plaintiffs' Motion for Summary Judgment [Doc. No. 44] is an affidavit of Michael Cimino, president of Celebrity Foods, which attest: "Prior to commencing this suit, I requested my counsel to correspond with Defendant William F. Donovan in his position as CEO of Versa Card.  On November 13, 2009, my attorney sent a letter by e-mail demanding removal of the restrictive legends upon certificates 3746 and 3747, but Defendants failed to respond."  A copy of the actual letter is attached to Plaintiffs' Reply [Doc. No. 53].

Agreement, in the form of the Letter and the instant lawsuit, Defendants had a clear duty to comply with their contractual obligations.  Therefore, the Court finds, as a matter of law, that Plaintiffs have shown the Defendants breached their obligations under the Settlement Agreement.

3.  *Protocol for Lifting Trade Restrictions*

Defendants also argue they are not in breach of the Settlement Agreement because Plaintiffs failed to follow the proper protocol for requesting that the trade restrictions be lifted, which required Plaintiff to make a demand that included all of the following: 1) presentation of the original certificate of stock; 2) a letter demanding removal of the Rule 144 restriction; 3) a processing fee of $150 per holder; 4) a letter stating to whom to issue the unrestricted shares and where to mail them; and 5) a stock power signature.  The Court does not find this argument persuasive.

The Settlement Agreement does not make these elements a precondition to the requirement that Versa Card "fully cooperate . . . in causing the restrictive legends to be removed from the certificates."  Cooperative efforts, in this Court's view, would include notice to Plaintiffs of any deficiencies in their demand so that those deficiencies could be promptly remedied.  Defendants provided no such notice.

4.  *Damages*

Finally, Defendants contend that Plaintiffs cannot prove the damages element of their breach of contract claim because Plaintiffs suffered no financial loss as a result of Defendants' breach, as the stock is actually more valuable now than it was in 2009.  Even assuming the company's stock is more valuable now, the Court finds Plaintiffs have suffered financial injury from Defendants' breach.  Plaintiffs' ability to trade their Retained Shares has been significantly

delayed due to Defendants' breach, and Plaintiffs have been harmed by their inability to sell the shares at a time of their choosing.  Therefore,  Plaintiffs have established the third element of a breach of contract claim.

B.      Breach of Duty of Good Faith and Fair Dealing

Plaintiffs also argue that Defendants acted in bad faith with respect to their contractual obligations.  "Under Delaware law, as interpreted by Delaware Supreme Court, the duty of good faith and fair dealing clearly attaches to all contracts."[21]  Each party to a contract must therefore "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[22]  However, where a claim is expressly governed by the contract, the injured party generally must bring a breach of contract claim and not an equitable bad faith claim.[23]

Here, Plaintiffs allege that Defendants acted in bad faith in preventing Plaintiffs from lifting the restrictions on their Retained Shares.  While this may be true, the doctrine of bad faith does not permit Plaintiffs to bring a separate bad faith claim where the express terms of the contract were breached and there is an adequate remedy in contract.[24]

C.      Unjust Enrichment (alternative)

Having found that the parties had a valid, enforceable written contract which governs this

---

[21] Fremont v. E.I. DuPont de Nemours & Co., 988 F. Supp. 870, 874 (E.D. Pa.,1997) (citing Pierce v. International Ins. Co. of Illinois, 671 A.2d 1361, 1366 (De.1996) ("So that the reasonable expectations of parties to a contract will not be defeated, we have held that a duty of good faith and fair dealing attaches to every contract, and this duty cannot be disclaimed.")).

[22] Kuroda v. SPJS Holdings, LLC, 971 A.2d 872, 888 (Del. Ch. 2009) (internal quotations omitted).

[23] Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc., 622 A.2d 14, 23 (Del. Ch. 1992); Kuroda, 971 A.2d at 891.

[24] Kuroda, 971 A.2d at 888.

dispute, the Court need not reach this alternative grounds for relief, .[25]

      D.    <u>Remedy</u>

Plaintiffs ask the Court to set aside the Settlement Agreement *or* to enforce the Settlement Agreement.  The Court will not set aside the Settlement Agreement, as it was a complete, unambiguous contract between the parties and it is possible to make Plaintiffs whole by enforcing the agreement and awarding damages, including damages consistent with general contract law and damages consistent with Section 8 of the Settlement Agreement.[26]  The amount of damages will be decided at a later date.

**IV.    CONCLUSION**

For the reasons set forth above, the Court finds Defendants are liable for breach of contract.  Plaintiffs' claims for breach of fiduciary duty and unjust enrichment will be dismissed, as will Plaintiffs' request to set aside the Settlement Agreement.

An appropriate Order follows.

---

[25] <u>Kuroda</u>, 971 A.2d at 891 (a claim for unjust enrichment is not available if there is a formal contract governing the relationship between the parties); see also <u>Resnick v. Woertz</u>, 774 F. Supp. 2d 614, 633 (D. Del. 2011).

[26] Section 8 reads, in relevant part: "Versa Card agrees to indemnify any MGL Releasee and any Third Party against any loss, damage, cost, or expense incurred by such MGL Releasee or any third party resulting from a violation of Section 6 [the Non-Interference provisions] of this Agreement."